**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **WINSTON KEITH GOFORTH,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No.** |
| | : | **5:02-cv-94 (HL)** |
| **DR. JOSEPH PARIS, et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

**ORDER**

Before the Court is Defendants' Motion to Exclude Plaintiff's Expert, Dr. Greifinger

(Doc. 115). For the reasons explained below, Defendants' Motion is granted.

**I. FACTS**

Plaintiff originally brought suit, under 42 U.S.C. § 1983, alleging prison officials at

Men's State Prison violated the Eighth Amendment[1] when they were deliberately indifferent

to his medical needs. Specifically, Plaintiff seeks to compel the Georgia Department of

Corrections to provide Plaintiff with antiviral therapy for Hepatitis C and recover damages

sustained as a result of the delay in treatment. According to Plaintiff, "Defendants' policies

and practices in delaying [Plaintiff's] treatment for four years, enforcing guidelines that deny

him treatment on grounds that are medically unjustified, and continuing to deny him

treatment despite knowledge of his failing condition, constitute deliberate indifference to a

---

[1] As made applicable to the states through the Fourteenth Amendment. <u>Louisiana *ex rel.* Francis v. Resweber</u>, 329 U.S. 459, 463, 67 S. Ct. 374, 376 (1947).

substantial risk of serious harm." ( Pl.'s Am. Compl. ¶ 51.)

Plaintiff retained the services of Dr. Robert Greifinger to provide expert testimony in the case concerning the treatment of Hepatitis C in a correctional setting. Dr. Greifinger prepared a written report containing a complete statement of all opinions he intends to address as required by Rule 26(a)(2) of the Federal Rules of Civil Procedure. Dr. Greifinger also includes a detailed account of his education and experience, as well as a copy of his curriculum vitae and a list of cases in which he has testified. Although Dr. Greifinger's report includes more than twenty separate paragraphs, he essentially offers the nine general opinions reproduced below:

A. Dr. Greifinger generally explains the symptoms, diagnosis, treatment, and progression of Hepatitis C. ( Rule 26(a)(2) Disclosure of Dr. Robert Greifinger, M.D. ¶¶ D(1)-(7), (15)-(17), (19).)

B.
> **"It is clear from his medical record that Mr. Goforth has cirrhosis caused by chronic Hepatitis C."**

(Rule 26(a)(2) Disclosure of Dr. Robert Greifinger, M.D. ¶ D(6).)

C.
> **"In my opinion, Mr. Goforth's medical record reveals a longstanding pattern of delaying and denying treatment for his Hepatitis C for reasons that are medically unjustified."**

(Rule 26(a)(2) Disclosure of Dr. Robert Greifinger, M.D. ¶ D(8).)

D.
> **"I note that Mr. Goforth was deemed ineligible for antiviral therapy**

2

**because he showed signs of compensated cirrhosis.”**

(Rule 26(a)(2) Disclosure of Dr. Robert Greifinger, M.D. ¶ D(13).)

E.
> **“It is my opinion that the decision to deny Mr. Goforth treatment based on the fact that he showed signs of stage IV fibrosis was not medically justified, because the pathologist was unable to stage the degree of scarring in the liver.”**

(Rule 26(a)(2) Disclosure of Dr. Robert Greifinger, M.D. ¶ D(14).)

F.
> **“Accordingly, it is my opinion that Mr. Goforth should have been given the option of HCV antiviral treatment.”**

(Rule 26(a)(2) Disclosure of Dr. Robert Greifinger, M.D. ¶ D(18).)

G.
> **“In my opinion, the Defendants in this case did not follow their own guidelines for the diagnosis and treatment of viral Hepatitis C.”**

(Rule 26(a)(2) Disclosure of Dr. Robert Greifinger, M.D. ¶ D(21).)

H.
> **“In my opinion, Mr. Goforth was harmed, both physically and emotionally, by the unnecessary and inappropriate delays in medical treatment in the following respects:**
>> **First, had Mr. Goforth been evaluated and treated in 2001, his disease would not have progressed to cirrhosis.**
>> **Second, the delay in treatment caused Mr. Goforth undue pain and suffering in the form of physical symptoms experienced from 2001-2005;**
>> **Third, because liver scarring causes resistance to insulin, the delay in treatment may have contributed to Mr. Goforth's onset of type II diabetes, a condition that has profound implications for the function of his other organs, namely his eyes, brain, heart, and kidneys;**
>> **Fourth, it is possible that the delay in treatment will prevent Mr. Goforth from achieving an SVR. Mr. Goforth had a viral load lower than two million copies per milliliter in**

**2001. His level was more than two million by December 2002. Scientific studies have demonstrated a lower response rate to treatment for patients with higher initial HCV RNA levels (> 2 million copies/mL) than those with lower levels, independent of genotype. We do not yet know whether Mr. Goforth will respond to the treatment.**

**Fifth, Mr. Goforth suffered worry, anxiety, and stress due to the inappropriate delay in medical care. This is documented in Mr. Goforth's medical health record."**

(Rule 26(a)(2) Disclosure of Dr. Robert Greifinger, M.D. ¶ D(22).)

I.

**"I understand that Dr. Ronald Koretz has offered an opinion in this case. Dr. Korentz has opined that there is no substantial evidence that antiviral therapy "does any good" and substantial evidence that treatment does harm. He has opined that given our current knowledge base, we should not be treating patients with Hepatitis C with the notion of preventing end-stage liver disease in the future. These opinions are not in conformity with the standard of care in the community. They do not comport with the 2002 National Institutes of Health consensus statement. They do not comport with the Centers for Disease Control Guidelines. They do no comport with the treatment guidelines issued by the American Association for the study of Liver Disease in 2004. Nor do they comport with the GDC's own clinical guidelines, which authorize and advocate antiviral therapy for certain patients with HCV."**

(Rule 26(a)(2) Disclosure of Dr. Robert Greifinger, M.D. ¶ D(23).)

Defendants now seek to exclude Plaintiff's proffered expert, Dr. Robert Greifinger. Defendants argue Dr. Greifinger is not qualified to testify competently regarding the matters he intends to address and that his testimony is unreliable. In response, Plaintiff argues "Dr. Greifinger is one of the preeminent experts in correctional medical care in the country and is qualified to give a reliable opinion on the systemic breakdown that led [Plaintiff] to

experience years of unacceptable delay in his medical care." ( Pl.'s Resp. to Defs.'s Mot. to Exclude 1.)

## II. ANALYSIS

Rule 702 of the Federal Rules of Civil Procedure governs the admissibility of expert testimony and provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Therefore, according to Rule 702, expert testimony is only admissible if it satisfies three broad requirements: (1) the witness offering the testimony must have knowledge, skill, experience, training, or education that qualifies the witness as an expert; (2) the witness's opinions must be reliable; and (3) the witness's opinions must assist the trier of fact. In addition, "[t]he burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).

First, the witness offering the testimony must be qualified to do so. There is no bright-line rule for determining whether a given witness is qualified to offer expert testimony. In contrast, the decision is inherently case-specific focusing on the individual facts and

circumstances of each case. Nevertheless, Rule 702 does offer a basic framework for evaluating a witness's qualifications by providing that expertise must be established by one or more of the following bases: knowledge, skill, experience, training, and education. Fed. R. Evid. 702.

In fixing the requisite level of knowledge, skill, experience, training, or education an expert witness must posses, courts are called upon to balance the advantages and disadvantages of expert testimony. On one hand, allowing only the most qualified witnesses to serve as experts reduces the risk a jury will overvalue the opinions of a minimally-qualified witness simply because the witness was classified as an expert by the court. On the other hand, requiring stellar qualifications of all witnesses could unnecessarily deprive the jury of helpful testimony based upon minor shortcomings in a witness's qualifications. As a result, courts liberally construe a witness's qualifications in favor of expert status and consider gaps in a witness's qualifications a matter for the jury to consider in determining what weight to give to the testimony. See Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989).

A witness's qualifications must correspond to the subject matter of his or her proffered testimony. See Jones v. Lincoln Elec. Co., 188 F.3d 709, 723 (7th Cir. 1999) (citing Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir. 1990)) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.").  In other words, a witness qualified as an expert in one subject may not offer

expert testimony on another subject. General knowledge in a field, however, is normally sufficient to qualify a witness as an expert in that field's specialties as well. For example, most courts conclude that a general practitioner can offer expert testimony concerning medical conditions routinely treated by specialists. E.g., Payton v. Abbott Labs, 780 F.2d 147, 155 (1st Cir. 1985) (holding two board-certified obstetrician-gynecologists were qualified to offer expert testimony in teratology, the study of abnormal development). Furthermore, unlike lay witnesses, it is not necessary that an expert witness have personal knowledge of the facts at issue in the case. See Fed. R. Evid. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.").

Second, the testifying witness's opinions must be reliable. In Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786 (1993), the Supreme Court of the United States directed district courts faced with the proffer of expert testimony to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93, 113 S. Ct. at 2796. Although Daubert originally involved only scientific expert testimony, the Supreme Court, in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 119 S. Ct. 1167, 1171 (1999), explained that the same type of analysis was also required when evaluating non-scientific expert testimony.

To assist Courts in conducting the required assessment, the Supreme Court provided a non-exclusive list of four factors to consider: "(1) whether the theory or technique can be

tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." Allison, 184 F.3d at 1312 (citing Daubert, 509 U.S. at 593-94, 113 S. Ct. at 2796). "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (citations omitted). Thus, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho, 526 U.S. at 152, 119 S. Ct. 1167, 1176.

Regardless of the specific factors considered in evaluating the reliability of expert testimony, "[p]roposed testimony must be supported by appropriate validation- i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590, 113 S. Ct. at 2795. In most cases, "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702, advisory committee's notes (2000 amendment). Yet, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Id. In any case, "[p]resenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough." Cook ex rel. Tessier v. Sheriff of Monroe County, 402 F.3d 1092, 1113 (11th Cir. 2005).

Third, expert testimony must assist the trier of fact to decide a fact in issue. In short, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262. Thus, expert testimony regarding issues within the understanding and experience of average citizens is properly excluded. United States v. Rouco, 765 F.2d 983, 995 (11th Cir. 1985). Nevertheless, "expert testimony is admissible if it will simply assist the trier of fact to understand the facts already in the record, even if all it does is put those facts in context." 4 Weinstein's Federal Evidence § 702.03[1] (2d ed. 2007). Yet, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63.

## A. Dr. Greifinger's Qualifications

Plaintiff states Dr. Greifinger is one of the foremost experts in correctional medicine in the country. For this reason, Plaintiff asserts Dr. Greifinger is clearly qualified to comment on the delays Mr. Goforth experienced in receiving antiviral treatment for Hepatitis C. Plaintiff also argues Dr. Greifinger is qualified to offer an opinion on the standard of care for Hepatitis C. As support Plaintiff points to the following: Dr. Greifinger authored a guide for correctional health care policy makers entitled "Prevention and Control of Viral Hepatitis;" Dr. Greifinger served as a consultant on a significant paper entitled "Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings," published by the Centers for Disease Control; Dr. Greifinger authored a report submitted to the United States Congress by the National Commission on Correctional Healthcare, entitled "Health Status of Soon-to-

be Released Inmates; and, Dr. Greifinger's work with the United States Department of Justice requires him to give an opinion on the quality of medical care received by inmates with Hepatitis.

Defendants do not object to Dr. Greifinger's qualifications to discuss policy drafting and administration in a correctional setting; however, Defendants do assert Dr. Greifinger is not qualified to testify regarding "the nature, evaluation, symptoms, and treatment of Hepatitis C and cirrhosis[;] the effect of delay in administration of antiviral therapy for Hepatitis C[;] and the testimony to be offered by Defendants's expert, Dr. Ronald Koretz." (Br. in Supp. of Defs.' Mot. to Exclude 6.) According to Defendants, Dr. Greifinger's area of expertise is correctional healthcare and quality management, not infectious diseases. In addition, Defendants point to the fact that Dr. Greifinger is not an internist, hepatologist, or epidemiologist; has not cared for an adult patient with liver disease in over thirty years; and has never prescribed Hepatitis C antiviral medication to a patient. Finally, Defendants argue that because Dr. Greifinger has never evaluated or treated a patient with Hepatitis C in a clinical or correctional setting, Dr. Greifinger is not qualified to offer expert testimony about Hepatitis C, the effect of any delay experienced by Plaintiff, or the opinions of Defendants' expert.

In addition to the qualifications cited by Plaintiff above, Dr. Greifinger has been a licensed physician since 1971 and has practiced in the field of correctional medicine for the past 19 years. (Rule 26(a)(2) Disclosure of Dr. Robert Greifinger, M.D. ¶ B(1).) Dr. Greifinger managed medical care at New York City's Rikers Island for approximately three

years, was the Chief Medical Officer of the New York State Department of Correctional Services for approximately six years, has served as a court-appointed monitor to monitor medical care in various jails across the country, and has served as a correctional healthcare consultant to numerous other cities, counties, and states. (Rule 26(a)(2) Disclosure of Dr. Robert Greifinger, M.D. ¶ ¶ B(1) - (3).) The Court finds Dr. Greifinger clearly qualified to offer expert testimony in the field of correctional medicine.

Dr. Greifinger's education and experience with the treatment of Hepatitis C is not nearly as impressive; however, the Court finds it adequate to meet the qualification standard under Rule 702. Although Dr. Greifinger has not directly cared for a patient with Hepatitis C in some time, he has participated in several published studies specifically examining the treatment of Hepatitis C in correctional settings. ( Pl.'s Resp. to Defs.'s Mot. to Exclude 7-8.) Further, while Dr. Greifinger is not an internist, hepatologist, or epidemiologist, he is a board-certified physician that has been practicing in some capacity for over thirty years.

Defendants heavily rely on the fact that Dr. Greifinger's medical specialty was pediatrics, rather than some specialty related to the treatment of infectious diseases. Defendants' reliance is misplaced because, as explained earlier, physicians are generally allowed to testify concerning conditions outside their specialty. It is undisputed that Dr. Greifinger is in fact a trained medical doctor, thus the Court finds Dr. Greifinger qualified to testify concerning the treatment, symptoms, and progression of Hepatitis C.

**B. Reliability of Dr. Greifinger's Opinions**

Plaintiff contends Dr. Greifinger's opinions are reliable because he is "familiar with

the signs and symptoms of liver disease," familiar "with the literature and the clinical guidelines published by various organizations," familiar with the treatment guidelines of various correctional institutions, and helped develop correctional clinical guidelines for Washington, D.C. and Pennsylvania. ( Pl.'s Resp. to Defs.'s Mot. to Exclude 9-10.) Plaintiff also points to specific portions of Dr. Greifinger's report and cites other experts that agree with Dr. Greifinger's conclusions.

Defendants first assert that "Dr. Greifinger's experience in policy development and administration would be a reliable basis if this case involved the lack of guidelines or inadequate guidelines; no such issue is before the Court." (Br. in Supp. of Defs.' Mot. to Exclude 10.) Accordingly, Defendants conclude Dr. Greifinger's experience is not a reliable basis for his opinions. Defendants also assert Dr. Greifinger's opinions are "merely uncertain references to literature and documents on websites" and unsupported conclusions. (Br. in Supp. of Defs.' Mot. to Exclude 10.)

From their arguments, it appears both Plaintiff and Defendants have missed the entire point of Daubert's reliability prong. First, in assessing the reliability of expert opinions, Courts focus solely on how the principles and methodology the expert used to reach his or her conclusion, not the actual conclusions reached by the expert. See Allison, 184 F.3d at 1306. Therefore, the proponent of expert testimony need not attempt to prove that the expert's opinions are scientifically correct, but rather must convince the court that the opinions were reached by using sound methodology.

Second, reliability is not automatically established by a witness's education or

experience. For example, when a witness is relying on his or her experience, the witness "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, advisory committee's note (2000 amendment). "If admissibility could be established merely by the ipse dixit of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." <u>Frazier</u>, 387 F.3d at 1262.

Turning to Dr. Griefinger's opinions, the Court is unable to find the opinions offered are sufficiently reliable because Dr. Griefinger failed to articulate a reliable basis for his opinions or specify the method used in arriving at his conclusions. With respect to Dr. Griefinger's statements regarding the symptoms, diagnosis, treatment, and progression of Hepatitis C, <u>supra</u> section I(A), and Dr. Korentz's opinions, <u>supra</u> section I(I), Plaintiff has offered little more than empty references to studies and reports by other doctors and policy analysts. Plaintiff suggests that because the opinions are backed up by other experts, Dr. Greifinger's opinion must be reliable. The Court disagrees. Dr. Greifinger cannot simply rely on other expert's opinions with out assessing the reliability of those opinions any more than the Court can rely on his opinions without assessing their reliability. Further, as the Court was not provided with specific references to the various studies, the Court is unable to assess the reliability of those studies which presumably serve as a basis for Dr. Greifinger's opinions. Without more support, the Court is left with unreliable opinions supported by more unreliable opinions.

With respect to Dr. Griefinger's opinions that Plaintiff has cirrhosis caused by chronic Hepatitis C, <u>supra</u> section I(B), that Plaintiff suffered medically unjustified delays in treatment, <u>supra</u> section I(C), and regarding the decision to deny Plaintiff antiviral treatment, <u>supra</u> sections I(D)- (E), Dr. Greifinger offers no support for his statements and no basis for his conclusions. With respect to Dr. Griefinger's opinion that Plaintiff was harmed by the delay in treatment, <u>supra</u> section I(H), Dr. Greifinger cites five reasons why he believes Plaintiff was harmed by the delay. Yet, upon inspection, most of these reasons are nothing more than general possibilities that can occur as a result of a delay in treatment. Rather than applying the specific facts of this case, Dr. Greifinger seems to assumes that Plaintiff suffered harm because harm is hypothetically possible when treatment is delayed. The remaining support offered by Dr. Greifinger consists of more unsupported opinions.

Finally, with respect to Dr. Griefinger's opinion that Defendants did not follow their own clinical guideline in treating Plaintiff, <u>supra</u> section I(G), Plaintiff asserts Dr. Greifinger fully explained his opinion in his deposition. While Dr. Greifinger does cite various guidelines in his deposition, he does not explain how those guidelines were violated by Defendants' actions regarding Plaintiff. For example, Dr. Greifinger asserts Plaintiff had none of the medical contraindications to therapy listed in the guideline; however, he does not provide support for this assertion or even discuss the medical contraindications listed in the guidelines.

## C. Relevance of Dr. Greifinger's Opinions

Plaintiff asserts "Dr. Greifinger's opinion on the standard of medical care for inmates

with Hepatitis C is highly relevant to this case." ( Pl.'s Resp. to Defs.'s Mot. to Exclude 13.) Plaintiff specifically points to Dr. Greifinger's opinion regarding Dr. Koretz's assertion that antiviral therapy should not be used for the treatment of Hepatitis C. Plaintiff argues Dr. Greifinger's opinion, that Dr. Koretz's assertion is not widely accepted, is especially relevant in this case. Defendants argue Dr. Greifinger's opinions are all irrelevant to the case. According to Defendants, as Dr. Greifinger offers nothing but broad conclusions, Dr. Greifinger's opinions amount to nothing more than argument that could be adequately addressed by Plaintiff's counsel. Although many of Dr. Greifinger's opinions may very well be relevant to this case, the Court need not discuss the matter as Plaintiff has failed to establish Dr. Greifinger's opinions are reliable.

### III. CONCLUSION

As explained herein, the Court finds Dr. Greifinger is qualified as an expert in the field of correctional medicine and the treatment, symptoms, and progression of Hepatitis C. In spite of Dr. Greifinger's qualifications, the Court finds that his opinions are not reliable and are therefore excluded. Accordingly, Defendants' Motion to Exclude Plaintiff's Expert, Dr. Greifinger, (Doc. 115) is granted.

**SO ORDERED**, this the 30th day of March, 2007.

/s/ Hugh Lawson
**HUGH LAWSON, Judge**

scs